

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:ANR
F. #2015R00270

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 17, 2025

By ECF and Email

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>Re: United States v. Villani
>Criminal Docket No. 22-405 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for July 9, 2025 at 12:30 p.m. For the reasons stated below, the government submits that a sentence of 37 months' imprisonment, which is the low end of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") as calculated by the Probation Department, but the high end of the Guidelines range calculated by the parties at the time of the guilty plea, would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

I.     Background

    A. The Offense Conduct

      The defendant's racketeering conviction stems from crimes he committed as a member of the Luchese crime family. The defendant, a Luchese captain, was the owner and principal of an illegal sports gambling business (the "Gambling Business.") (*See* Presentence Investigation Report ("PSR") ¶¶ 2, 26.) The defendant was inducted into the Luchese crime family in the 2000s and rose to soldier and eventually to acting captain. (*Id.* ¶ 26.)

A. The Illegal Gambling Business

The defendant led the Gambling Business along with several associates of the Luchese crime family. The Gambling Business's primary purpose was to generate revenue for the defendant and the Luchese crime family. The Gambling Business operated through a website and when a new bettor joined, the bettor received login information, and their account was linked to a "bookmaker" who was responsible for paying and collecting their sports bets. Bets were then placed electronically on the website, but payments occurred in person through bookmakers. Bookmakers were responsible for taking bets from a group of bettors, collecting and paying individual bettors, and settling with the defendant. (*Id.* ¶¶ 26-27.) The defendant received a percentage of each bookmaker's earnings. (*Id.* ¶ 27.) The Gambling Business involved only cash. Between 2004 and 2020, the Gambling Business generated at least $35 million in revenue. (*Id.* ¶ 26.) The defendant personally profited at a minimum $15 million from his work as the leader of the Gambling Business. Records obtained from the Gambling Business's website showed that the operation regularly took bets from between 400 and 1,300 bettors each week, most of whom were based in New York City and the metropolitan area.

Beginning in approximately 2000, the defendant moved his existing gambling business to Costa Rica to avoid law enforcement detection. (*Id.* ¶ 30.) In 2002, the defendant moved the Gambling Business online. Between 2002 and 2004, the defendant spent six months of the year in Costa Rica to manage the Gambling Business, and in 2004, another bookmaker ("John Doe") took over the defendant's work responsibilities in Costa Rica, which was around the time of the defendant's prior federal conviction for the original iteration of the Gambling Business. (*Id.*) As part of his work, John Doe maintained ledgers for the Gambling Business which recorded payments and debts owed.

The defendant employed several trusted associates to help him manage the various operations for the Gambling Business. These employees included co-defendants Louis Tucci, Jr. and Dennis Filizzola, who reported directly to the defendant as part of their work for the Gambling Business. Both were responsible for picking up and collecting money from other bookmakers and met frequently with the defendant. (*Id.* ¶ 23.) In addition, co-defendants James Coumoutsos, who operated in the Gambling Business under the name "Quick," and Michael Praino, who operated under the name "Platinum," were significant bookmakers for the Gambling Business. (*Id.* ¶ 25.)

The defendant involved numerous other members of the crime families in the Gambling Business. The defendant regularly associated and met with crime family members, including repeatedly meeting with the acting boss of the Luchese crime family. (*Id.* ¶ 28.) For example, in May 2020, the defendant met with members of the administration of the Luchese family in a way to avoid law enforcement eavesdropping and surveillance by meeting in the middle of a park where it is unlikely that law enforcement could electronically monitor their conversations.

### B. Laundering the Illicit Proceeds from the Gambling Business

In addition to operating the Gambling Business, the defendant engaged in money laundering to conceal the source and nature of his illicit proceeds which generated significant cash profits for the defendant and others in the scheme. Specifically, the defendant and Filizzola laundered cash proceeds from the Gambling Business. Among other ways, at the defendant's direction, Filizzola took proceeds from the Gambling Business and used them to purchase U.S. Postal Service money orders in false names, which were then made payable to one of the defendant's property companies to appear as legitimate rental payments. (*Id.* ¶¶ 44-45.)

In 2017 and 2018, the defendant opened two Playa Bowl stores in Pleasantville and Bronxville, New York. Playa Bowls sell smoothies, juices, and acai bowls. The defendant owns the Playa Bowl in Pleasantville and co-owns the Playa Bowl in Bronxville with Tucci. During the construction of these stores, the defendant asked John Doe to provide him with large sums of cash to pay for their construction. This is corroborated by the ledgers for the Gambling Business that recorded large cash payments from John Doe to the defendant who according to John Doe is identified as "Ira" in the ledgers when the Playa Bowl stores were being built.[1]

### C. Attempted Extortion of John Doe

Beyond operating the Gambling Business and laundering its illicit proceeds, the defendant also extorted John Doe. Between October 2019 and October 2020, the defendant threatened John Doe over the non-payment of approximately $300,000 that he stole from the Gambling Business. (*Id.* ¶ 46.) On April 27, 2020, the defendant met with John Doe and discussed the debt he owed to the Gambling Business, a portion of which conversation is excerpted below:

VILLANI: Give me one sec, I'll finish up. [Tucci leaves]. Listen. I spoke to Mike. I'm going to tell you this one time. You fuck up again, there's gonna be a serious, serious problem, alright? He told me you had to fucking go to Miami, he told me the whole fucking thing. How you previously juggle my money, fuck with anything, we're going to have a problem. I'm telling you. We've been friends for 35 years, that's why you still work for me. I'm not—I don't

---

[1] The government disputes the defendant's claim that none of the funds from the Gambling Business were traced to the Playa Bowl stores as demonstrated by the ledgers for the Gambling Business (attached as Exhibit A) and statements from John Doe. For example, in early November, John Doe paid the defendant $25,000, and later $20,000 which John Doe explained were payments the defendant used to pay contractors for the construction of the Playa Bowl stores. See Exhibit A at 1.

care if it's his fault. There's going to be no stopping it. I'm telling you as a friend, as a boss. As being together 35 years. There's no more room for anything. [John Doe] it's over. No one's going to stop it. Alright? So just do the fucking right thing. I want the money on the sheet [UI] when it fucking open up, work that out and make sure you, going forward, I want to get paid. Alright? I'm telling you right now. I'm not fucking putting up with anything. Alright? There's no fucking up, I'm not going to let you [UI] money again. [UI] So just do the right thing. Alright? I'm not going to repeat myself. I'm not going to every say this again. We're just going to have a problem if I find out. Alright? And I don't want to threaten you with my friends or anything, I'm not gonna, you put me in a fucking hole with this guy. I'm fucking juggling, I laid out extra money to pay this guy. I don't need this shit. Alright? I'm just telling you there's no more talking about this from now until the day one of us dies. Me or you. There's no talking. You do it again, there's a problem. Alright?

Exhibit B. Later, on October 10, 2020, the defendant met with John Doe again regarding the debt he owed. During the conversation, John Doe confessed to the defendant in sum and substance, that he had misused some of the proceeds of the Gambling Business, including to pay down loans John Doe owed to another individual. After John Doe told the defendant that he borrowed from a Gambling Business customer, the defendant became angry and repeatedly threatened John Doe, directing him to get the money to pay back the defendant. This October 10, 2020 conversation is excerpted below:

VILLANI: Listen to me, go get my fucking money. I'm telling you right now. Go get the thirty thousand by Wednesday or you got a fucking problem. I'm asking you for three months for this fucking guy. I want to see him. When is he coming in?

\*\*\*

VILLANI: Listen, get the fucking money. I'm telling you right now, you don't get this money – fucking run away. Go get this fucking money. Are you fucking kidding me? You go to my fucking customers to borrow money? Are you out of your fucking mind? Are you out of your fucking...I want your fucking business and I want to move all the fucking plays. I didn't get a fucking quarter in a year and a half

4

|  |  |
|---|---|
|  | from your business. Don't tell me these guys all didn't pay. It's fucking bullshit. |
|  | *** |
| VILLANI: | Well go get it. I'm telling you right now [John Doe], go get the fucking money. I'm not putting this on top of anything. We're gonna fucking Monday, leave time - we're sitting down. |
| JOHN DOE: | Alright. |
| VILLANI: | I want this fucking money this week. And if I lose this fucking guy...I'm telling you. [John Doe], I'll tell you - you're pushing me. You don't know me. You're pushing me. |
| JOHN DOE: | I do know you. |
| VILLANI: | You don't. You're pushing me. You're really fucking pushing me. I'm asking you six fuck...I asked you in fucking June. Is there anything else you gotta tell me? And this fucking guy, I'm telling you, I'm gonna have fucking beef with him. Who the fuck is he to give you money without coming to me? |

Exhibit C. John Doe believed that the defendant or other members of the Luchese crime family would physically harm or kill him if he did not repay the debt owed.

### D. Related Search of the Defendant's Properties

As part of the investigation, the FBI executed a series of property searches in December 2020 and recovered additional extensive evidence of illegal gambling by the defendant, principally in the form of large amounts of cash at his properties. For example, from the defendant's residences, including from his vehicles and/or person, FBI agents seized over $55,000 in cash. At a second apartment rented by the defendant, agents seized over $407,000 in cash, a set of brass knuckles, and gambling ledgers (including some that had been shredded). (*Id.* ¶ 49.)

B. <u>The Defendant's Criminal History</u>

On March 19, 1998, the defendant was arrested for engaging in illegal gambling. At the time of his arrest, the defendant and the other individuals involved were standing around three tables which were covered with daily betting sheets, gambling records, cellular phones, and over $9,000 in cash. The defendant was charged with possession of gambling records in the second degree. The defendant was sentenced to a conditional discharge. (PSR ¶ 94.)

Between January 2000 and November 2002, the defendant and other Luchese crime family associated were operating the prior iteration of the Gambling Business. The defendant was a soldier in the Luchese crime family at the time. The defendant, along with his co-conspirators, operated this illegal gambling business which involved bookmaking and gambling devices, earning a gross revenue of at least $2,000 per day. The defendant made seven trips to Costa Rica between January 2000 and September 2002 and acted as a liaison for this illegal sports betting operation between the call center in Costa Rica and his co-conspirators based in New York. Because he provided oversight of the operations in Costa Rica, the defendant was the manager or supervisor for this illegal gambling operation. The defendant was charged in this District with conspiracy to engage in illegal gambling and received a sentence of four months' imprisonment. (*Id.* ¶ 95.)

C. <u>Guidelines Calculation</u>

The government agrees with the Probation Department's calculation of the Guidelines Offense Level, which is as follows:

<u>Illegal Gambling and Money Laundering</u>

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2E3.1(a)(2)) | 12 |
| Plus: Defendant was an Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Adjusted Offense Level | <u>16</u> |

<u>Extortion of John Doe</u>

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2E3.1(a)(2)) | 18 |
| Plus: Offense involved an Express or Implied Threat of Death or Bodily Injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus: Defendant was an Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Adjusted Offense Level | <u>24</u> |

Multiple Count Analysis (U.S.S.G. § 3D1.2)

       Highest Adjusted Offense Level:     <u>24</u>

       Units:

              Illegal Gambling and Money Laundering     0.5

              Extortion of John Doe     1.0

              Total Units     1.5

       Levels Added (U.S.S.G § 3D1.4):     +1

(PSR ¶¶ 71-90, 143.) With a three-level reduction for acceptance of responsibility, the adjusted offense level is 22. With an additional two-level reduction for a global resolution pursuant to the defendant's plea agreement, the total adjusted offense level is 20. The government and the Probation Department calculated the defendant's Criminal History Category as Category II. (*Id.* ¶ 98.) Accordingly, based on Probation's Calculation and a Criminal History Category of II, the applicable Guidelines range is 37 to 46 months' imprisonment. (*Id.* ¶ 143.) This calculation differs from the government's calculation in the plea agreement because the government incorrectly did not conduct a multiple count analysis. As such, the plea agreement—based on a Criminal History Category II and a total offense level of 18, which includes reductions for acceptance of responsibility and global resolution—results in a Guidelines range of 30 to 37 months' imprisonment.

    II.    <u>Applicable Law</u>

       The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-252 (2d Cir. 2015), *as amended* (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. *See* 18 U.S.C. § 3553(a)(2)(D).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding to arrive at the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

III. <u>A Guidelines Sentence of 37 Months' Imprisonment Is Warranted</u>

The government respectfully requests that the Court impose a Guidelines sentence of 37 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's offense, promote respect for the law, provide just punishment, afford general and specific deterrence, and achieve the other purposes of sentencing.

A.  Consideration of the Section 3553(a) Factors Warrant a Guidelines Sentences of 37 Months' Imprisonment

Here, the Section 3553(a) factors support a sentence of 37 months' imprisonment. As an initial matter, the nature and circumstances of the offense warrant a Guidelines sentence. The defendant has been convicted of racketeering, including, as predicate racketeering acts, operating the Gambling Business for almost two decades and laundering the illicit proceeds from it. The defendant committed these crimes as a member of the Luchese crime family, which he has been a part of since at least the 2000s. The defendant was able to run the massive Gambling Business for decades by using his membership in the Luchese crime family to ensure payment from debtors, including through the attempted extortion of John Doe. And the defendant's criminal efforts generated substantial revenue for both the defendant and the Luchese crime family. These are serious crimes that warrant a serious punishment.

Beyond the defendant's operation of the Gambling Business, his extortionate conduct of using threats of violence to collect a debt from John Doe is characteristic of organized crime and must be met with a meaningful custodial sentence. Incarceration is necessary not only to hold the defendant accountable, but also to deter others from engaging in similar conduct and to protect the community from further acts of intimidation or retaliation from members of organized crime families. A sentence of 37 months' imprisonment reflects the seriousness of the offense, promotes respect for the law, and sends a clear message that the use of fear and violence to enforce criminal debts will not be tolerated.

The history and characteristics of the defendant, and the need to promote respect for the law and specifically deter the defendant, similarly weigh heavily in favor of a sentence of 37 months' imprisonment. To start, the defendant is not a first-time offender. The defendant has a prior conviction for illegal gambling in the Eastern District of New York, for which he received a sentence of 4 months' imprisonment for conduct that was the prior iteration of the Gambling Business involved in the instant offense. That prior federal sentence failed to deter him and underscores his persistent disregard for the law.

The defendant also completely ignores his decades-long membership in the Luchese crime family and years of committing crimes on its behalf and attempts to paint himself as a hardworking business owner and family man. But as detailed above, the defendant used his stature in the Luchese crime family to lead the operation of the Gambling Business for nearly two decades and to violently threaten John Doe over the collection of his debt. The defendant's leadership and his role in the Luchese crime family directly contributed to the Gambling Business's long-term success and profitability—all of which benefited the defendant, his co-conspirators, and the Luchese crime family. The defendant personally profited over $15 million from the Gambling Business.

9

Overall, the defendant engaged in criminal conduct for more than two decades—first from at least 2000 to 2002, when he was previously convicted of illegal gambling, and then from 2004 until his arrest in 2022 in connection with the instant offense. A Guidelines sentence of 37 months' imprisonment is necessary not only to hold the defendant accountable, but also to send a clear message—to this defendant and to others—that repeated criminal conduct will not be tolerated. Such a sentence is critical to protect the public from a defendant who, despite prior incarceration, has continued to commit serious crimes.

Finally, a significant sentence of 37 months' imprisonment is necessary to send a broader message, both to the community and to those who would join criminal enterprises like the Luchese crime family, that participation in such criminal enterprises will be met with serious punishment.

### B. The Defendant's Family Circumstances Do Not Justify a Downward Departure

The main thrust of the defendant's request for a downward departure is based on his stated need to care and provide for his elderly and ill parents and his ex-wife. *See* Def. Mem. 2-8. The defendant's family circumstances should not undermine efforts to hold him accountable for his criminal conduct. Indeed, in a policy statement, the Sentencing Commission has stated that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. The Commission has set forth the following circumstances for courts to consider in assessing whether sentencing weight should be given to a defendant's family responsibilities:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's

10

> > caretaking or financial support irreplaceable to the defendant's family.
>
> (iv) The departure effectively will address the loss of caretaking or financial support.

*Id.* § 5H1.6, Application Note 1(B). As the Second Circuit has recognized, in the context of family responsibilities, "only if a district court finds the hardship to be exceptional may it downwardly depart on that basis." *See United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998) (citing *United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997)); *United States v. Johnson*, 964 F.3d 124, 129 (2d Cir. 1992). Such circumstances have historically involved instance in which "the family was uniquely dependant on the defendant's ability to maintain existing financial and emotional commitments." *Sprei*, 145 F.3d at 535. By contrast, where the consequences faced by a defendant's family "are no greater than those faced by most criminal defendants who have a family," a departure is inappropriate. *United States v. Faria*, 161 F.3d 761, 763 (2d Cir. 1998). Courts have denied downward departures where caregiving is shared, or another family member can assume the defendant's responsibilities. *United States v. White*, 301 F. Supp. 2d 289, 294-95 (S.D.N.Y. 2004) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration, and [i]t is not unusual . . . for a convicted defendant's incarceration to cause some hardship in the family." (internal quotations and citations omitted)); *United States v. Robles*, 331 F. Supp. 2d 218, 221 (S.D.N.Y. 2004) ("The Court finds that the hardships that [the defendant's] father will face if [the defendant] is incarcerated, while undoubtedly difficult, are not so extraordinary when compared to the hardships faced by the elderly parents of any federal incarcerated defendant who is thereby unable to provide financial and emotional support during this period.").

The defendant's proffered circumstances do not justify the downward departure he seeks and do not rise to the level of "extraordinary." In opposing the defendant's application for a downward departure, the government does not intend to downplay or depreciate the difficulties of caring for his ill elderly parents and ex-wife. However, being a caregiver to his family is not so "extraordinary" to justify a downward departure. Notably, the defendant's two "successful, independent" adult children appear to be well suited to provide care for their grandparents and mother while the defendant is incarcerated. *See* Def. Mem. 9-10. While the defendant may not believe that such a scenario would be ideal, his preference does not make the potential hardship extraordinary or exceptional. Although all circumstances are unique, the government does not agree—and the defendant has not shown—that the hardship alleged by the defendant "substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant." *See* U.S.S.G. § 5H1.6, Application Note 1(B)(ii).

Importantly, although the defendant emphasizes his concern for his ex-wife due to her illnesses, he nevertheless put her at risk of criminal prosecution by arranging for her to hold a no-show job with CLS Products from late 2017 through December 2020—

11

revealing that his professed concern did not stop him from involving her in his criminal conduct when it suited his interests. CLS Products placed the defendant's ex-wife on their payroll, transmitting payments to the Villanis, but the defendant reimbursed the owner of CLS Products in cash for the payroll amounts paid to his ex-wife. This is corroborated by records from CLS Products, interviews with its employees, and his ex-wife's W-2 statements. Additionally, while the defendant was incarcerated for his prior illegal gambling conviction in this District, John Doe was instructed by the defendant to pay large cash sums to his ex-wife to ensure the continued operation of the Gambling Business. This conduct demonstrates the defendant's willingness to involve his own family in his criminal activity, only to later invoke those same relationships to gain leniency at sentencing.

While the defendant's sentencing memorandum and supporting letters reference the defendant's strong ties to his family and community, all of those ties apparently existed at the time of the offense conduct, too, when the defendant was committing serious federal crimes. *See* Def. Mem. 9-16, 20-21. The unfortunate consequences of the defendant's criminal conduct on his family and community were entirely foreseeable to the defendant. No one else but the defendant made the choices to commit serious crimes that have placed the defendant at risk of imprisonment. *See United States v. Al Kassar*, No. 07-CR-354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). It is also worth recognizing that the defendant's ability to support his family and community was made possible only by the millions of dollars he illegally obtained by operating the Gambling Business for almost two decades.

Finally, it is worth highlighting that the primary reason the defendant was able to generously provide for his family and community was because for over two decades he profited millions of dollars in illicit proceeds from the Gambling Business. These illicit proceeds financed the defendant's lifestyle and those around him, who are the very same individuals asking for this Court's leniency at sentencing.

### C. The Government Can Prove the Attempted Extortion of John Doe by a Preponderance of the Evidence[2]

Beyond operating the Gambling Business and laundering its proceeds, the defendant's repeated and escalating threats to John Doe—designed to collect a debt through

---

[2] The defendant failed to timely object to the PSR regarding Probation's inclusion of the defendant's attempted extortion in its Guidelines calculation. The government is prepared to prove the defendant's participation in the attempted extortion of John Doe by a preponderance of the evidence at a *Fatico* hearing. Such evidence includes consensually recorded conversations, transcripts, and testimony. The government respectfully submits that, although there may be disputed issues of material fact regarding the defendant's

fear and intimidation—further underscore the need for a sentence of incarceration. Over the course of a year, the defendant repeatedly threatened John Doe in connection with the debt he owed. To collect this debt, the defendant resorted to menacing language designed to instill fear and compel payment—conduct that is both dangerous and unlawful.

The defendant's threats were not idle or isolated. The threats escalated over time and were delivered in person with a backdrop that suggested the involvement of organized crime. In the April 27, 2020 conversation with John Doe excerpted above, the defendant made repeated and insistent serious threats against John Doe, laced with explicit and implicit references to violence and retribution—particularly powerful given the defendant's position as a leader in the Luchese crime family. In that conversation, the defendant continuously warned John Doe that if he "fucks up again," there will be a "serious, serious problem," stating that "there's going to be no stopping it," and ominously declaring, "from now until the day one of us dies… You do it again, there's a problem." These are not idle expressions of frustration—they are calculated warnings by the defendant designed to instill fear, backed by the threat of irreversible consequence of death. In this same conversation, the defendant's reference to not wanting to "threaten [John Doe] with my friends" is a thinly veiled allusion to the defendant leveraging the mafia to enforce his demands—a signal of his willingness to resort to violence or intimidation to collect the debt owed by John Doe.

But the defendant's threats did not end there. On October 10, 2020, the defendant's threats only escalated. During that conversation, the defendant's command—"Go get the thirty thousand by Wednesday or you got a fucking problem"—is a stark ultimatum, conveying that John Doe's noncompliance will result in serious repercussions. The defendant's directive to John Doe to "run away" if the money isn't paid underscores the gravity of the situation, implying that John Doe's safety is in jeopardy. Further, the defendant's persistent expressions of anger and his declaration—"you're pushing me . . . you don't know me"—communicate the defendant's volatility and a gravitation towards violence. The tone and content of these threats are especially serious when considered in the context of the defendant's position in the Luchese crime family, where such language is not rhetorical but often a prelude to violence.

The defendant completely mischaracterizes and minimizes these threats as not containing a "whiff of violence—actual or threatened." Def. Memo 22-23. This is a gross misrepresentation of the April 27, 2020 and October 10, 2020 conversations in which the defendant's own words demonstrate that he both implicitly and explicitly threatened violence against John Doe to extort him into paying the debt he owed to the Gambling Business. The defendant also entirely disregards the context in which these statements were made—at the

---

attempted extortion of John Doe, such issues may be resolved based on the excerpted conversations included in the government's submission.

time the defendant was the acting captain of the Luchese crime family which made his statements to John Doe to be even more grave.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a Guidelines sentence of 37 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Antoinette N. Rangel
Assistant U.S. Attorney
(718) 254-7481

cc: Ilana Haramati, Esq.
Henry Mazurek, Esq.
United States Probation